UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Cargo Protectors, Inc.,

Plaintiff,

v.

American Lock Company,

Defendant.

**MEMORANDUM OPINION AND ORDER**
Civil No. 00-284 ADM/AJB

---

Randall T. Skaar, Esq., Norman M. Abramson, Esq., and Eric H. Chadwick, Esq., Patterson & Keough, P.A., Minneapolis, Minnesota, appeared for and on behalf of the Plaintiff.

Robert M. Ward, Esq., Lewis T. Steadman, Jr., Esq., and Michael S. Leonard, Esq., Hill & Simpson, P.C., Chicago, Illinois, and Dean C. Eyler, Esq., and Craig D. Diviney, Esq., Dorsey & Whitney LLP, Minneapolis, Minnesota, appeared for and on behalf of the Defendant.

---

## I. INTRODUCTION

The above-titled matter came on for hearing before the undersigned United States District Judge on March 16, 2000, pursuant to Plaintiff Cargo Protectors, Inc.'s ("Cargo Protectors") motion for a preliminary injunction [Doc. No. 7]. Cargo Protectors argues that Defendant American Lock Company's ("American Lock") sale of a "hockey puck" lock guard device violates a confidentiality agreement between the parties and infringes a patent held by Cargo Protectors. For the reasons set forth below, the motion is denied.

## II. BACKGROUND[1]

Cargo Protectors is a two-employee business based in Minneapolis, Minnesota, that

[1]Though Cargo Protectors was entitled to submit a reply brief, it was not submitted within the time period required by Local Rule 7.1. In ruling on this motion, it was unnecessary to rely upon the arguments presented in the reply brief.

FILED 4-11-00
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD ______
DEPUTY CLERK ______

designs, manufactures, and sells locks and lock-related equipment. The company holds an exclusive license for the rights to United States Patent No. 5,172,574 (the "'574 Patent"), which patents a round, metal guard to protect the hasps of "hockey puck" padlocks commonly used to secure commercial delivery van doors and other doors. Ralph J. Perfetto invented and patented the device and granted an exclusive license to Cargo Protectors. See Declaration of Avron Rosenberg, Ex. E.

In 1997, Cargo Protectors approached lock companies, including American Lock, in an effort to market customized padlock guards based on the '574 Patent. American Lock, located in Illinois, is a lock device manufacturer with nationwide sales. American Lock expressed interest in the padlock guard and sent to Cargo Protectors on September 12, 1997 an Idea Submission Policy & Agreement ("Idea Submission Agreement" or "Agreement"). See Rosenberg Decl., Ex. B (hereinafter "Agreement").

According to an internal memorandum dated September 22, 1997, American Lock had already tested a shrouded hasp presented by another company. See Affidavit of William F. Noone, Ex. 9. Regardless, American Lock entered into the Idea Submission Agreement with Cargo Protectors on October 1, 1997. See Agreement at 2. It is unclear whether American Lock had disclosed its knowledge of the other company's hasp protector to Cargo Protectors before entering into the Agreement.

The parties moved forward with discussions about how to adapt the patented padlock guard to American Lock's needs. Cargo Protectors submitted three padlock guard prototypes that would work with American Lock padlocks. See Noone Aff., Ex. 8. The initial prototypes were rejected by American Lock, but the parties continued to work together on a design that would be

suitable for American Lock's purposes. In December 1998, March 1999, and June 1999, Cargo Protectors submitted subsequent prototypes and drawings at American Lock's request, some of which incorporated American Lock's suggested modifications. See Rosenberg Decl. ¶ 14. All prototypes that American Lock considered were made and submitted by Cargo Protectors. See Declaration of Christopher Haczynski ¶¶ 6, 8, 9, 10; Rosenberg Decl. ¶¶ 14, 15, 16; Affidavit of David Anderson ¶¶ 8, 17, 19; Affidavit of Steve Sjodin ¶¶ 6, 7 & Ex. A.

American Lock eventually adopted one of Cargo Protectors' prototypes as the model for its padlock guard. See Haczynski Decl. ¶ 10 & Ex. 1; Rosenberg Decl. ¶ 18. Cargo Protectors understood and American Lock reassured that Cargo Protectors would supply American Lock with padlock guards based on the accepted prototype. See Rosenberg Decl. ¶ 18.

Meanwhile, Cargo Protectors in or about January 1999 entered into an agreement with Master Lock Company, a large manufacturer of locks and an American Lock competitor, to produce and sell a version of the padlock guard based on the '574 Patent and designed for Master Lock padlocks. Master Lock has since purchased more than 10,000 padlock guards from Cargo Protectors as a result of the sales relationship. See Rosenberg Decl. ¶ 12.

Despite Cargo Protectors' understanding that it would also be the exclusive supplier for American Lock's padlock guards, American Lock sent to Cargo Protectors and other potential suppliers on October 29, 1999, requests for competitive bids to make the proposed padlock guard. See Rosenberg Decl. ¶ 21. Cargo Protectors responded that the proposed product was based on its prototype and would infringe the '574 Patent. Furthermore, Cargo Protectors contended that American Lock's actions in sending the request for bids to Cargo Protectors' potential competitors constituted a disclosure in violation of the Idea Submission Agreement.

American Lock responded that its product fell outside the scope of the '574 Patent and the Agreement. In January 2000, Cargo Protectors learned that American Lock planned to begin manufacturing and marketing of the padlock guard. Advertisements for the device appeared in American Lock's sales catalog in or about February 2000. See Rosenberg Decl. ¶¶ 23, 25 & Ex. F, ¶ 26 & Ex. G. Cargo Protectors now seeks to enjoin American Lock from selling its padlock guard.

## III. DISCUSSION

### A. Standard of Review

Whether the underlying claim is for patent infringement or breach of contract, four factors are evaluated in a request for preliminary injunction: (1) the probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of an injunction is in the public interest. See Novo Nordisk of N. Am., Inc. v. Genentech, Inc., 77 F.3d 1364, 1367 (Fed. Cir. 1996); Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981). The plaintiff bears the burden of proof on all four factors. See Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987).

No one factor is dispositive; rather, each factor must be considered when weighing the balance of the equities. See Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc., 908 F.2d 951, 953 (Fed. Cir. 1990); United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1179 (8th Cir. 1998). However, a moving party is required to show threat of irreparable harm. See Modern Computer Sys., Inc. v. Modern Banking Sys., Inc., 871 F.2d 734, 737 (8th Cir. 1989). In a patent case, the likelihood of success and irreparable harm factors play central roles. See Sofamor

Danek Group, Inc. v. DePuy-Motech, Inc., 74 F.3d 1216, 1219 (Fed. Cir. 1996).

A preliminary injunction is a "drastic and extraordinary remedy" and is "not to be routinely granted." Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993).

**B. Analysis of Factors**

**1. Likelihood of success on merits**

**a. Patent infringement**

To obtain a preliminary injunction in a patent infringement action, the plaintiff must establish the reasonable likelihood of proving patent validity and infringement by the defendant. See H.H. Robertson, Co. v. United Steel Deck, Inc., 820 F.2d 384, 390 (Fed. Cir. 1987). Grant of a preliminary injunction does not require proof "beyond all question." See id.

The '574 Patent is presumed to be valid under 35 U.S.C. § 282. American Lock, which may overcome the presumption by a showing of clear and convincing evidence that the patent is invalid, proffered no evidence of invalidity. Thus the patent is presumed valid for the purposes of this motion.

Cargo Protectors asserts that American Lock's padlock guard infringes the '574 Patent both literally and under the doctrine of equivalents. An infringement analysis requires two steps. The first step is to construe the meaning and scope of the patent claims. The second step is to determine whether the accused invention infringes the patent claims as construed. See Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995), aff'd, 517 U.S. 370, 116 S.Ct. 1384 (1996). The court construes disputed claim language as a matter of law. See Markman, 52 F.3d at 978. The court then determines whether the accused device is likely to fall within the scope of the claims. See Sofamor, 74 F.3d at 1220. To infringe, an accused device must embody

each claim limitation or its equivalent. See id.

Under a literal infringement analysis, the accused device is held up against the construed claims to determine whether each limitation on the claims can be found in the accused device. See Fonar Corp. v. Johnson & Johnson, 821 F.2d 627, 631 (Fed. Cir. 1987). Under the doctrine of equivalents, a patent is infringed if the accused device performs substantially the same work in substantially the same manner and accomplishes substantially the same result. See Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 608 (1950).

In conducting claim construction, a court is to consider three sources when ascertaining the meaning of the claim: the claim language, the specification, and the prosecution history. See Markman, 52 F.3d at 979. Markman, however, does not obligate a court to interpret claims conclusively and finally during a preliminary injunction proceeding at an early stage in a case. See id. at 1221. "A trial court may exercise its discretion to interpret the claims at a time when the parties have presented a full picture of the claimed invention and prior art." Id. Furthermore, findings and conclusions as to claim construction at the preliminary injunction stage are not binding at trial. See Illinois Tool Works, Inc. v. Grip-Pak, Inc., 906 F.2d 679, 681 (Fed. Cir. 1990). In International Communication Materials, Inc. v. Ricoh Co., 108 F.3d 316 (Fed. Cir. 1997), the Federal Circuit held that a district court did not abuse its discretion in denying a preliminary injunction based on a "tentative claim construction," given that there were "substantial open issues and questions that must be litigated before a finding of infringement can be made, including claim construction . . . ." Id. at 318.

The parties in this case have not set forth full arguments on the proper interpretation of the '574 Patent. Though a complete and final claim construction cannot be determined at this

early point in the litigation, the probability of infringement must be examined. See Atari Games Corp. v. Nintendo of Am., Inc., 897 F.2d 1572, 1575 (Fed. Cir. 1990) ("The district court need not make binding findings of fact, but at the very least, must find probabilities that the necessary facts can be proved."). Thus, the claim construction now set forth is tentative and substantial issues must be litigated before a finding of infringement can be made.

For the purposes of this motion, Cargo Protectors relies solely on Claim 1 of the '574 Patent, which claims a burglar-resistant locking system to be used with padlocks of the type disclosed in U.S. Patent No. 3,769,821. Claim 1 reads in relevant part:

> wherein the improvement comprises a guard for the padlock, and means for supporting the guard in a predetermined relationship to said staple means;
>
> (a) said guard having the form of a high strength and distortion-resistant substantially cylindrical hollow shell of metal or metal alloy, said shell having (i) circumferential front and back edges, (ii) an inner diameter slightly greater than the diameter of said peripheral face of the housing of the padlock so as to enable the latter to be axially inserted into and removed from the shell with a nearly sliding fit, (iii) an axial width between its front and back edges somewhat greater than the thickness of the padlock between said front and back faces of the latter, and (iv) a gap in its circumference defined between two axially extending circumferentially spaced edges, the width of said gap being slightly greater than the diameter of the key cylinder of the padlock; and
>
> (b) said supporting means having (i) a member of metal or metal alloy with a flat front surface, (ii) an opening in said member for accommodating said staple means, and (iii) said guard welded along said circumferential back edge thereof to said member at said front surface of the latter in substantially symmetrically surrounding relation to said opening in said member and with said gap located so as to accommodate the key cylinder of the padlock only when the axial passageway in the housing of the padlock is properly aligned with and able to receive said staple means upon insertion of the padlock into said guard;
>
> (c) whereby, when the padlock is inserted into said guard and has said staple means received in said axial channel of the padlock and the key cylinder is operated to protract the bolt of the padlock through the apertured staple means and to lock the protracted bolt in position, the locking system is rendered resistant to rapid and noise-free destruction of the staple means and the bolt of the padlock.

Rosenberg Decl., Ex. A (hereinafter "'574 Patent") at 10 (emphasis added).

Cargo Protectors offers by way of proposed claim construction only that a prototype drawing it submitted to American Lock "was understood to be an embodiment of the invention claim in the '574 Patent" and would "fall within the ambit of Claim 1." See Pl. Mem. Supp. Prelim. Inj. at 9 & Ex. A. It does not point to the claim specification or the prosecution history file to support its conclusory interpretations of the claim language. American Lock similarly sheds very little light on the meaning of the claim language, other than through expert testimony. A court may not resort to expert testimony as to the meaning of a patent claim unless the claim language itself, the patent specification, and the patent's prosecution history file fail to provide the meaning of the claim. See Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996). American Lock argues, however, that its device does not have "an opening in said member for accommodating said staple means" as required by element (b) of Claim 1. It further argues that the accused device does not have "the apertured staple means" listed in element (c) of Claim 1.

As evidence of infringement, Cargo Protectors compares its drawing of the padlock guard device it submitted to American Lock in its negotiations, see Pl. Mem. Supp. Prelim. Inj., Ex. A, to a photograph of American Lock's padlock guard currently for sale, see id., Ex. B. Cargo Protectors argues: "Even a cursory examination of the latter reveals that American Lock's guard is merely a mirror image of Cargo Protectors' guard with the differences, if any, being of no import." Id. at 9. A cursory examination, however, fails to provide adequate proof that *either* the Cargo Protectors' drawing or the accused device fall within the properly construed scope of Claim 1. Such a comparison between prototypes cannot at this juncture satisfy the burden of proof of likelihood of infringement placed on Cargo Protectors. Infringement analysis requires a

comparison between the accused devise and the properly construed claim language, not between proposed embodiments. See Markman, 52 F.3d at 976.

While the drawing and the photograph do look strikingly similar, a "cursory examination" reveals that neither seems to have an "opening" to accommodate a staple means, as the plain language of the claim element requires. Rather, both models have staple means attached to the hasps. It is unclear from the claim language and the specification[2] whether such an embodiment was contemplated by the claim. Therefore, Cargo Protectors has not met its burden in proving the likelihood of success on the merits of its patent infringement claim.

**b. Breach of contract**

Cargo Protectors argues that American Lock breached the terms of the Idea Submission Agreement by "relying on 'confidential' and 'secret' information provided to it by Cargo Protectors to create its new product." Pl. Mem. Supp. Prelim. Inj. at 14. To prevail on its breach of contract claim, Cargo Protectors must prove the existence of a valid and enforceable contract, the breach of the contract by the defendant, and the performance by the plaintiff and the resultant injury to the plaintiff. See Allstate Ins. Co. v. Winnebago County Fair Ass'n, Inc., 475 N.E.2d 230, 233 (Ill. Ct. App. 1985).[3] The parties do not dispute that the Agreement was validly formed or that Cargo Protectors performed its obligations under the Agreement. Therefore, the sole issue before the Court is whether American Lock breached the terms of the Agreement.

American Lock disputes that it breached the Agreement, and in doing so, sets forth

---

[2]The prosecution history was not entered as evidence for this motion.

[3]Given valid formation, the contract's choice of law provision stating that the agreement shall be interpreted according the laws of Illinois shall be enforced here. See Rosenberg Decl., Ex. B at 2.

several defenses that require interpretation of the Agreement's terms. The rules of contract interpretation require that an agreement reduced to writing is presumed to speak the intention of the parties who signed it. See Air Safety, Inc. v. Teachers Realty Corp., 706 N.E.2d 882, 884 (Ill. 1999). A court is to examine the "four corners" of the document to discern the intention of the parties. See id. If the language is unambiguous, then the contract is interpreted without resort to extrinsic evidence. See id. The contract is not to be interpreted by reference to particular words or isolated phrases, but rather by considering each part in light of the others. See Leahy Realty Corp. v. American Snack Foods Corp., 625 N.E.2d 956, 966 (Ill. Ct. App. 1993). "Courts should avoid giving an interpretation to a provision that will nullify the clear and unambiguous language of another provision." Id.

The Idea Submission Agreement states in relevant part:

> American Lock Company will hold and maintain all information concerning the Idea confidential and secret, in the same manner as it protects its own proprietary information, and that American Lock Company will not use the Idea unless or until the Idea or the information concerning the Idea:
>
> a) [i]s or becomes known to the public through no fault of American Lock Company;
>
> b) [i]s already known to American Lock Company prior to the disclosure by the Discloser [Cargo Protectors], as shown by prior records of American Lock Company; or
>
> c) becomes known to American Lock Company by disclosure from a third party who has the right to disclose the information without secrecy obligations.

Rosenberg Decl., Ex. B at 1 (emphasis added). Handwritten at the bottom of the first page of the Agreement are the words "hasp to protect American 2000 padlock," which was included to describe what was meant by "Idea."

From the plain language of this provision, American Lock breaches the contract if it

discloses to a third party the "Idea" contemplated by the Agreement or if it "use[s] the Idea" for its own purposes without the permission of Cargo Protectors. Cargo Protectors argues that American Lock committed such a breach when it began selling a padlock guard with a design based on prototypes and drawings submitted by Cargo Protectors during the parties' negotiations. Cargo Protectors contends that any and all prototypes and drawings that it submitted to American Lock during their ongoing negotiations are "information" within the purview of the Agreement. American Lock, however, contends that the only "information" protected is the original prototypes first submitted to American Lock on October 23, 1997, shortly after the parties had signed the Agreement. See Noone Aff., Ex. 8. Thus, it is argued, the Agreement would not protect subsequent prototypes that were modified at the request of American Lock.

When looking solely at the language of the contract, it is significant that the word "information" is preceded by "all." Such wording unambiguously means that information surrounding an idea can be more than a single, initial submission. However, whether "information" includes discussions, prototypes, pictures, drawings, correspondence, or other communications is unclear. If the language of a contract is susceptible to more than one meaning, then ambiguity is present. See Air Safety, 706 N.E.2d at 884. Only then may the court consider extrinsic evidence to resolve the ambiguity. See id. In this case, the meaning of "information" is ambiguous.

The affidavit of David Anderson in this case resolves this ambiguity. Anderson, a former American Lock product manager, worked with Cargo Protectors when the idea to develop a padlock guard was first proposed. See Affidavit of David Anderson ¶ 2. Anderson recommended that Cargo Protectors and American Lock enter into the Idea Submission

Agreement. See id. ¶ 6. Furthermore, it was Anderson's standard practice during his twelve-year tenure with the company to recommend such an agreement when American Lock worked with an outside party presenting an idea. See id. ¶ 5. Anderson avers that the Agreement "was intended to cover all subject matter and discussions related to Cargo Protectors' development of the Padlock Guard based upon and covered under the '574 Patent." Id. ¶ 7. This statement is key to the meaning of the ambiguous term "all information" as American Lock, as drafter of the document, would have a better understanding of the Agreement's terms. Anderson's interpretation buttresses Cargo Protectors' understanding. Therefore, the parties intended that "information" would cover "all subject matter and discussions" relating to the idea. Any prototype submitted by Cargo Protectors during its negotiations with American Lock constitutes "subject matter" falling within the definition of "information" and is protected by the Agreement.

American Lock counters that its version of the padlock guard was invented solely by American Lock employees and the resulting product was not one of the items specifically disclosed by Cargo Protectors pursuant to the Agreement. American Lock points to the provision in the Agreement that states:

> You agree that your rights to the Idea are limited solely to the Idea in the exact form in which it is presented, and that you are submitting the Idea in exactly the form in which you wish to have American Lock Company evaluate it.

Rosenberg Decl., Ex. B at 1 (emphasis added). American Lock contends that, although Cargo Protectors continued to submit amended prototypes upon request throughout their negotiations, all the ideas and changes incorporated into subsequent prototypes came solely from American Lock employees. See Haczynski Decl. ¶¶ 5, 6.

The evidence supports that, while American Lock employees suggested changes and

modifications, Cargo Protectors submitted all prototypes relating to the padlock guard. See Haczynski Decl. ¶ 10. That American Lock requested modifications to suit its purposes does not transform Cargo Protectors' protected idea into one of its own. The final prototype that eventually became the model for American Lock's padlock guard was submitted by Cargo Protectors in exactly the form it wished to have American Lock evaluate it. When American Lock used the prototype for its own design and then placed its padlock guard in the marketplace, there is a likelihood it breached the Agreement.

American Lock further argues, however, that use or disclosure of Cargo Protectors' final prototype does not constitute breach because information about the padlock guard idea was known to American Lock and to the public prior to disclosure by Cargo Protectors. In particular, American Lock states that it was aware of a competing padlock protector made by another company before it entered into the Agreement with Cargo Protectors. A memo dated September 22, 1997, reveals that American Lock had tested a prototype provided by a company called Vigilante. See Noone Aff., Ex. 9. American Lock's argument fails, however, because it proffers no evidence that Cargo Protectors' final prototype, in the exact form it was presented to American Lock, was known to Vigilante or others before it was presented to American Lock. Vigilante's prototype presumably was not identical to the final Cargo Protectors prototype given that American Lock rejected Vigilante's idea yet accepted Cargo Protectors'.

American Lock also argues that Cargo Protectors agreed to rely solely on its rights under patent law to protect its idea. The pertinent provision of the Agreement states: "[I]n protecting your Idea, you shall rely solely on your rights under the Patent, Trademark, and Copyright laws of the United States . . . ." American Lock implies in its argument that this contract language

precludes Cargo Protectors' breach of contract claim. To interpret the provision in such a manner would nullify the remainder of the agreement and make it pointless. A court is to interpret a document "to give effect to all its provisions and to render them consistent with one another." Roubik v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 674 N.E.2d 35, 37 (Ill. Ct. App. 1997). Furthermore, "an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." Restatement (Second) on Contracts § 203(a) (1981). To read into the provision that Cargo Protectors is foreclosed from alleging breach of the Agreement would be to render the remainder of the document of no effect.

The Court finds that Cargo Protectors has met its burden in proving a likelihood of success on the merits of its breach of contract claim.

**2. Irreparable harm**

Cargo Protectors argues that it would be irreparably harmed if American Lock is not enjoined from selling its version of the padlock guard. Because Cargo Protectors has not met its burden in proving likelihood of success on the merits of its patent claim, it is not entitled to a presumption of irreparable harm. See H.H. Robertson, 820 F.2d at 390.

Cargo Protectors argues that money damages would not compensate for the resulting confusion in the marketplace, and American Lock's continued sales would erode any goodwill Cargo Protectors has built in marketing its own product. Because American Lock is a larger company, it would be able to outspend Cargo Protectors in advertising its own product. Cargo Protectors, however, has already secured considerable sales of its product through its relationship with Master Lock, a large competitive rival of American Lock. Furthermore, if Cargo Protectors

is ultimately successful in its patent infringement claim, it will be able to enforce its rights under the patent against other alleged infringers and secure licensing agreements to control future sales.

Cargo Protectors also argues that, as exclusive licensee of the '574 Patent, each sale that infringes the patent detracts from the possible number of sales that could be made by the exclusive licensee. Given, however, that Cargo Protectors has not met its burden in proving likely infringement, such a claim is speculative.

Damages resulting from a possible breach of contract are quantifiable. Cargo Protectors currently is selling its device to other customers and would be able to specify its lost profits based on lost sales resulting from a breach of the Agreement. Furthermore, Cargo Protectors could easily calculate the value of the time spent developing the prototypes for American Lock and the costs it incurred to do so. Money damages would be adequate in making Cargo Protectors whole again if it prevails on its claims. Therefore, Cargo Protectors has failed to meet its burden in proving irreparable harm.

**3. Balance of the harms**

Cargo Protectors has borne considerable cost in its efforts to develop and adapt its padlock guard for American Lock's product. If it were to prevail on its claims, such efforts would be adequately compensated through money damages. If Cargo Protectors were not to prevail, however, an injunction on American Lock's production and sales could cause uncompensated damage of lost investment and production expense related to its current sales of a potentially noninfringing product. Therefore, the balance of the harms favors American Lock.

**4. Public interest**

Protecting patent rights lies in the public interest. See Illinois Tool, 906 F.2d at 684.

This interest is counterbalanced by American Lock's continuing right to compete in the event Cargo Protectors does not prevail on its patent infringement claim. Given that Cargo Protectors failed to meet its burden in showing a likelihood of success, the public interest disfavors a preliminary injunction.

The public interest also favors the enforcement of contracts. However, any damage caused by breach of the Agreement can be redressed through money damages without denying padlock guard customers a competitive marketplace. Therefore, the public interest factor does not strongly favor Cargo Protectors.

In weighing all of the factors, and in considering Cargo Protectors' failure to prove irreparable harm in particular, it would be inequitable to issue an injunction against American Lock.

## IV. CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Cargo Protectors' motion for a preliminary injunction [Doc. No. 7] is **DENIED**.

BY THE COURT:

Ann Montgomery

ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

Dated: April 11, 2000